FEE PAID

FILED

2022 DEC -2 PM 1:53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY rsm

**DEREK SMITH LAW GROUP, LLP**
Matt E.O. Finkelberg, (SBN 329503)
633 West 5th Street, Suite 3250
Los Angeles, CA 90071
Telephone: (310) 602-6050
Facsimile: (310) 602-6350
Email: matt@dereksmithlaw.com
*Attorneys for Plaintiff and Realtor Ajay Gupta*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES ex. rel.<br>DR. AJAY GUPTA<br><br>Plaintiff and Relator,<br><br>vs.<br><br>MONOGRAM HEALTH PROFESSIONAL SERVICES; MONOGRAM HEALTH, INC. individually and d/b/a/ MONOGRAM HEALTH; LBMC EMPLOYMENT PARTNERS, LLC; CIGNA; CIGNA CORPORATION; CIGNA HOLDINGS CO; CIGNA HOLDINGS, INC.; HUMANA; HUMANA, INC.,<br><br>Defendants. | **2:22-CV-08758-MWF-JCx**<br>Case No.<br><br>**CIVIL ACTION COMPLAINT DOCUMENT TO BE KEPT UNDER SEAL (DO NOT PLACE ON PACER)**<br><br>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)<br><br>DEMAND FOR JURY TRIAL |

Relator and Plaintiff, Dr. Ajay Gupta, M.D. ("Dr. Gupta" or "Plaintiff") by and through his attorneys, Derek Smith Law Group, LLP, hereby files the following civil action complaint against Defendants Monogram Health Professional Services, PC; Monogram Health, Inc.; LBMC Employment Partners, LLC.; Cigna; Cigna Corporation; Cigna Holdings Co; Cigna Holdings, Inc.; Humana; and Humana, Inc., for violations of the False Claims Act, 31 U.S.C. §3729, and for retaliation under the False Claims Act, 31 U.S.C. §3730(h), for Defendants' false billing of Medicare and Medicaid, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), and the Physician Self-Referral Law 42 U.S.C. § 1395nn, and the laws of the State of California for retaliation against Plaintiff for having engaged in protected conduct, which ultimately led to Defendants' unlawfully terminating Plaintiff's employment. Plaintiff hereby avers the following:

## **PARTIES**

1. Plaintiff, Dr. Ajay Gupta (hereinafter referred to as "Plaintiff" or "Relator" or "Dr. Gupta"), is an adult male individual who is and has been a resident of the State of California. Plaintiff brings this lawsuit as both a Plaintiff and Relator in connection with claims Plaintiff presents subject to a wrongful termination and for claims Relator presents on behalf of the United States government.

2. Defendants Monogram Professional Services ("Monogram" or "Defendants") is an organization duly existing under the laws of the State of

Delaware and at all times relevant to this civil action was Plaintiff's employer doing business in the State of California.

3. Defendants Monogram Inc., individually and d/b/a Monogram Health ("Monogram" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant, Plaintiff's employer doing business in the State of California.

4. Defendant, LBMC Employment Partners, LLC individually and d/b/a Monogram Health ("Monogram" or "Defendants"), is an organization duly existing under the laws of the State of Delaware, at all times relevant, Plaintiff's employer doing business in the State of California.

5. At all times relevant to this civil action, Plaintiff was an employee of Defendants Monogram, a business organization conducting business in the state of California and entering into employment agreements with employees who worked and resided in the State of California. (Defendants Monogram Professional, Monogram Inc., and LBMC is hereinafter collectively referred to as "Monogram.").

6. This court has personal jurisdiction over Defendants because Monogram and/or its subsidiaries and/or its partners maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. Monogram transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

7. Defendants, Cigna ("Cigna" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant doing business in the State of California.

8. Defendants, Cigna Corporation ("Cigna" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant doing business in the State of California.

9. Defendants, Cigna Holdings Co ("Cigna" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant doing business in the State of California.

10. Defendants, Cigna Holdings, Inc., ("Cigna" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant doing business in the State of California.

11. Defendants, Cigna; Cigna Corporation; Cigna Holdings Co; Cigna Holdings, Inc. (collectively "Cigna") through its subsidiaries and affiliates, owns and operates numerous Medicare Advantage Organizations ("Cigna MA Organizations") that administer Medicare Advantage healthcare plans ("Cigna MA Plans"). The Cigna MA Organizations, like other MA organizations, are responsible for covering the cost of services rendered by healthcare providers (such as hospitals and doctors) to Medicare beneficiaries enrolled in Cigna MA Plans. The Cigna MA Organizations, in turn, receive monthly capitated payments from CMS for providing such coverage. CMS adjusts these payments for demographic

and health status "risk" factors that affect beneficiaries' expected healthcare expenditures. To make these adjustments, CMS relies on "risk adjustment" data, including medical diagnosis codes, submitted by MA organizations. This payment model is designed to pay MA organizations more to provide healthcare for sicker enrollees (expected to incur higher healthcare costs) and less for healthier enrollees (expected to incur lower costs). MA organizations are required under their contract with CMS and pursuant to applicable federal regulations to certify the "accuracy, completeness, and truthfulness" of the diagnosis data submitted to CMS.

12. This court has personal jurisdiction over Defendants because Cigna and/or its subsidiaries maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. Cigna transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

13. Defendant, Humana ("Humana" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant, doing business in the State of California.

14. Defendant, Humana, Inc., ("Humana" or "Defendants"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant, doing business in the State of California.

15. Defendants, Humana and Humana, Inc., (collectively "Humana") through its subsidiaries and affiliates, owns, and operates numerous Medicare

Advantage Organizations ("Humana MA Organizations") that administer Medicare Advantage healthcare plans ("Humana MA Plans"). The Humana MA Organizations, like other MA organizations, are responsible for covering the cost of services rendered by healthcare providers (such as hospitals and doctors) to Medicare beneficiaries enrolled in Humana MA Plans. The Humana MA Organizations, in turn, receive monthly capitated payments from CMS for providing such coverage. CMS adjusts these payments for demographic and health status "risk" factors that affect beneficiaries' expected healthcare expenditures. To make these adjustments, CMS relies on "risk adjustment" data, including medical diagnosis codes, submitted by MA organizations. This payment model is designed to pay MA organizations more to provide healthcare for sicker enrollees (expected to incur higher healthcare costs) and less for healthier enrollees (expected to incur lower costs). MA organizations are required under their contract with CMS and pursuant to applicable federal regulations to certify the "accuracy, completeness, and truthfulness" of the diagnosis data submitted to CMS.

16. This court has personal jurisdiction over Defendant, Humana because Humana and/or its subsidiaries maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. Humana transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

17. This court has personal jurisdiction over all Defendants because Defendants and/or its subsidiaries transact business so frequently and with such regularity in the State of California that they avail themselves to the protections of California's laws, are at home in this jurisdiction, and subject to the personal jurisdiction of this court.

18. At all times relevant to this civil action, Plaintiff and Realtor, Dr. Ajay Gupta was employed by Defendants Monogram and physically performed all work in the State of California where Dr. Gupta also resided, lived, and held citizenship.

19. At all times relevant to this civil action, Defendant Monogram and Defendant Cigna (the "healthcare insurer" or "insurer") were engaged in an unlawful conspiracy whereby Monogram and Cigna engaged in fraudulent acts intended to deceive individuals who held Cigna Health Insurance policies (the "insureds") in order to reduce the amount of money paid by Cigna for healthcare services covered by Cigna for the insureds, and in order to increase the amount of money that Defendants received through Medicare and Medicaid programs. Defendant Cigna then paid Defendants Monogram kickbacks based on the percentage of money that Monogram could save Cigna by reducing Cigna's medical care costs or based upon the amount of money that Monogram could make Cigna by increasing the amount of money that Cigna received through Medicare and/or Medicaid.

20. At all times relevant to this civil action Defendants Cigna and Monogram operated this scheme to reduce costs for Cigna despite an obvious and negative impact this scheme had on the patients who healthcare services were negatively impacted through the reduction and or elimination of lifesaving, life extending and/or quality of live improving medical care.

21. At all times relevant to this civil action, Defendants Monogram and Defendant Humana were engaged in an unlawful conspiracy whereby Monogram and Humana (the "healthcare insurer" or "insurer") engaged in fraudulent acts intended to deceive individuals who held Humana Health Insurance policies (the "insureds") in order to reduce the amount of money paid by Humana for healthcare services covered by Humana for the insureds and in order to increase the amount of money that Defendants received through Medicare and Medicaid programs. Defendant Humana then paid Defendants Monogram kickbacks based on the percentage of money that Monogram could save Humana by reducing Humana's medical care costs based upon the amount of money that Monogram could make Humana by increasing the amount of money that Humana received through Medicare and/or Medicaid.

22. At all times relevant to this civil action Defendants Humana and Monogram operated this scheme to reduce costs for Humana despite an obvious and negative impact this scheme had on the patients who healthcare services were

negatively impacted through the reduction and or elimination of lifesaving, life extending and/or quality of live improving medical care.

23. At all times relevant to this civil action, Defendants was the agent, servant, employee, co-venturer, and/or coconspirator of each of the remaining Defendants and was at all times mentioned herein acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of such relationship.

24. Each of the Defendants was acting in a single or joint employer, agency, employer, and/or alter ego capacity such that they are liable for the acts of their agents and/or employees.

25. At all times relevant to this civil action, Plaintiff, Ajay Gupta, M.D., was employed by Defendants Monogram as a Nephrologist Physician for Defendants Monogram, and was asked to cooperate and further the fraudulent scheme designed to persuade patients with chronic kidney disease to forego medically necessary treatments recommended by local, front-line, treating, medical professionals.

26. The objective of this scheme was to reduce medical care costs for the insurance company-coconspirators, who then paid Monogram kickbacks based on a percentage of the money that the health insurers did not have to pay to cover their insureds.

27. Monogram markets this same set of illegal products to multiple health insurance providers across the United States including Agilion Health, Cigna,

Humana, Point 32 Health, Harvard Pilgrim Healthcare, TUFTS Health Plan, Scan Health Plan, Devoted Health, A Banner University Health Plans, Amerigroup an Anthem Company, Avent Health, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield Louisiana, Well Care Health Plans, and the United States Department of Veteran Affairs.

28. To facilitate this scheme requires the Defendants to materially deceive patients with chronic kidney disease so that the patients allow Defendants access to the process whereby medical decision are made. Defendants engage in the material deception of patients through intentional, fraudulent misrepresentations and omissions, with the objective being that patients permit Defendants to participate in the medical decision-making process. To facilitate this deception, patients have to believe that Defendants are there to help the patients and that Defendants' representations and recommendations are made in good faith. Defendants hide their actual intentions from the patients and patients are not informed that Defendants' interest lies in saving money by reducing and/or eliminating lifesaving, life extending, and quality of life improving medical services.

29. Accordingly, Defendants were engaged in a scheme to reduce that amount of money that the health insurers paid for medical services for their insureds, and the negative impact this scheme had on patient outcomes was disregarded so that Monogram, Humana, and Cigna could make money.

**JURISDICTION AND VENUE**

30. Subject matter jurisdiction is appropriate before this Court under Federal Question Jurisdiction, the False Claims Act, 31 U.S.C. §3729, and for retaliation under the False Claims Act, 31 U.S.C. §3730(h), for Defendants' violations of Medicare and Medicaid laws and regulations, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), and the Physician Self-Referral Law 42 U.S.C. § 1395nn.

31. Pursuant to 28 U.S.C. § 1391 et seq., Personal jurisdiction and venue are appropriate before this Court as Defendant, Monogram, Defendant, Cigna, and Defendant, Humana were doing business in the State of California, and Plaintiff lived and worked in California during Plaintiff's employment for Defendants Monogram.

32. Moreover, significant actions giving rise to this litigation occurred in the State of California, in the Central District of Southern California.

**SUMMARY OF FACTS**

33. At all times relevant to this civil action complaint, Defendants were engaged in a two-part scheme designed on one side, to increase the amount of money Defendants received per patient for medical treatment patients required in connection with lucrative diagnoses codes, and on the other side, convince patients and their families not to elect the medical treatment associated with those same lucrative diagnosis codes. Defendants sought to increase revenues paid for by the

government through Medicare and Medicaid and at the same time to lower costs of medical care by convincing patients that they did need the medical treatment that should have been covered by the same money Defendants received from the government for those medical conditions associated with the codes.

34. At all times relevant to this civil action, Defendants submitted patient diagnosis information to the Government to inflate payments received from the Medicare Part C program, also called the Medicare Advantage Program. Specifically, for risk adjustment payment purposes, Defendants submitted to the Centers for Medicare and Medicaid Services ("CMS") diagnoses of certain serious and chronic medical conditions that were based solely on forms completed during visits to patients' homes conducted by Monogram employees retained and paid by Monogram, on behalf of Cigna and Humana.

35. Defendants knew that: (1) the vendors, who were often nurse practitioners, who conducted these home visits did not perform or order the testing, imaging, or other diagnostic steps necessary to reliably diagnose these conditions; (2) the patients did not receive any treatment for the purported medical conditions during the home visits; (3) in some cases no other healthcare providers, such as the patients' primary care physicians, had diagnosed or treated the patients for these medical conditions during the year in which the home visits occurred; and (4) these diagnoses did not comply with CMS's requirements for coding diagnoses. Nevertheless, Monogram, on behalf of Cigna and Humana, submitted these

diagnoses to CMS to claim increased payments, and certified on an annual basis that their diagnosis data submissions were "accurate, complete, and truthful."

36. Cigna and Humana contracted and engage Monogram to conduct home visits of Cigna MA Plan and Humana MA Plan members across the country.

37. The home visits were typically conducted by nurse practitioners, and on occasion by other nonphysician healthcare providers such as registered nurses and physician assistants (together, these individual providers are referred to as the "Vendors").

38. Based on each visit, the Vendors identified medical conditions designed to increase the amount of money that Defendants received through government programs like Medicare and/or Medicaid.

39. Monogram, on behalf of Cigna and Humana expressly structured the home visits for the purpose of capturing and recording lucrative diagnosis codes that would significantly increase the monthly capitated payments made by CMS to the Cigna MA Organizations and Humana MA Organizations.

40. The purpose of the visits was not to treat patients' medical conditions.

41. Indeed, Monogram maintained a branch of its organization called "the Managed Care Side" which specifically did not engage in any medical treatment and existed to identify these lucrative diagnoses codes, and to deceive the patients into allowing Monogram influence into the medical decision-making process.

42. When identifying Plan members/patients to receive these home visits, Monogram, on behalf of Cigna and Humana targeted beneficiaries who were likely to yield the greatest risk score increases. This meant that Defendants targeted the sickest patient who were costing the insurance companies the most amount of money in due to insurance coverage payouts for costly medical services like inpatient dialyses.

43. At all times relevant to this civil action, Defendants knew that certain conditions could not be reliably diagnosed in a home setting and without extensive diagnostic testing or imaging.

44. Monogram Vendors did not have the medical equipment necessary to conduct such testing and imaging in patients' homes, and Venders often did not order the necessary diagnostic tests or make referrals to providers who would. For example, Monogram Vendors generally lacked equipment for collecting blood or urine samples and imaging technology such as an x-ray machine or echocardiographic equipment.

45. Defendants also knew that the scope of the in-home assessments was limited. The Monogram Vendors spent limited time with the patients and did not conduct a comprehensive physical examination. When completing the assessments and recording the diagnoses, the Monogram Venders relied largely on the patients' own self-assessments and their responses to basic screening questions.

46. Plaintiff and Relator, Dr. Ajay Gupta was hired by Defendants Monogram and assigned to oversee a team of Monogram Venders, comprised of nurse practitioners, nurses, and other non-physician medical professionals. Through this position, Dr. Gupta gained firsthand knowledge of the facts and allegations contained in this civil action complaint.

47. At all times material to this civil action, Plaintiff, Dr. Ajay Gupta was a medical doctor, and a Nephrologist, and Clinical Scientist.

48. Dr. Gupta has extensive experience and expertise in the field of chronic kidney disease and has dedicated his life's work to this field of medicine.

49. Dr. Gupta invented the use of Ferric Pyrophosphate Citrate ("Triferic") as the first and only carbohydrate-free soluble iron compound suitable for parenteral administration to hemodialysis patients. Triferic received FDA approval in January 2015 for administration via hemodialysis solution ("T-HD") and intravenous infusion ("T-IV") in March 2020.

50. TRIFERIC is the first and only FDA-approved treatment indicated for the replacement of iron to maintain hemoglobin in adult patients with hemodialysis-dependent chronic kidney disease.

51. Plaintiff, Ajay Gupta is also involved in scientific research in the field of nephrology, hypertension, endocrinology, nutrition, immunology, and COVID-19.

52. Plaintiff's life's work and passion has been in the field of nephrology and Dr. Gupta's mission is to identify unmet medical needs for patients suffering from chronic kidney disease.

53. Dr. Gupta has a history of extensive research and development in the field of medicine and nephrology and was Board certified twice in the field of nephrology (in 1996 and 2006) and has been working as a nephrologist for almost thirty-five (35) years, since 1988.

54. Dr. Gupta has treated patients through his own practice and has authored numerous publications including original manuscripts and Letters to the Editors, either on his own or jointly with other experts in the field of nephrology.

55. In November 2021, Dr. Ajay Gupta began his employment with Defendants Monogram.

56. Dr. Gupta's first day of employment with Defendants Monogram was sometime around November 1, 2021.

57. Sometime around September 23, 2021, Dr. Gupta met with Chief Operating Officer ("COO") for Defendants Monogram, Chris Chi, in San Diego, California.

58. COO of Defendants Monogram, Chris Chi sold the position of Regional Medical Director to Dr. Gupta, explaining that Dr. Gupta's primary responsibilities would include working with patients with chronic kidney disease.

59. During the interview and beginning of his employment, Dr. Gupta relied on the representations made by COO, Chris Chi, that Dr. Gupta would work directly with patients with chronic kidney disease who required medical care from a nephrologist.

60. Soon after Dr. Gupta began his employment with Monogram, it became evident to Dr. Gupta, through representations made by Defendants, that the primary objective was not increasing the quality patient care and patient outcomes, but instead was reducing costs for the health insurance companies that partnered with Monogram, including but not limited to Cigna and Humana[1].

61. Soon after Dr. Gupta began his employment with Defendants Monogram, it became evident that Monogram's primary objective was reducing medical services that patients needed so that Monogram partners including Cigna and Humana could increase profit margins by spending less money through the reimbursement of medical costs associated with medical services of their insureds.

62. One of the ways in which Dr. Gupta discovered Defendants' true mission, the scheme, was when Dr. Gupta attended a workshop in Nashville, Tennessee. At this workshop, Dr. Gupta learned that Monogram's business model, and ability to stay in business, was based upon Monogram achieving its objectives

[1] Other health insurance companies with whom Monogram has partners are listed on Monogram's website (https://www.monogramhealth.com/) and include Agilion Health, Cigna, Humana, Point 32 Health, Harvard Pilgrim Healthcare, TUFTS Health Plan, Scan Health Plan, Devoted Health, A Banner University Health Plans, Amerigroup an Anthem Company, Avent Health, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield Louisiana, Well Care Health Plans, and the United States Department of Veteran Affairs.

to lower the cost of healthcare for insurers through the elimination and/or reduction of medical services that patients needed.

63. Dr. Gupta also learned this from Monogram employee, lawyer and COO, Chris Chi, who was not a doctor but still issued directives that affected medical services delivered to patients.

64. Dr. Gupta learned that the large health insurance conglomerates that partnered with Monogram paid kickbacks to Monogram, based on a portion of the money that Monogram helped the insurance companies save by reducing or eliminating medical services, including lifesaving, life extending, and/or quality of life improving medical services.

65. Defendants Monogram and its officers and employees communicated to Dr. Gupta and other medical professionals that the primary objective was cutting costs through the reduction of medical services that patients needed, and at all times relevant to this civil action, this objective was achieved at the expense of patient safety, patient care, and best possible medical outcomes for Cigna and Humana policy holders.

66. Defendants Monogram actively promoted the objective of saving money for the health insurance companies that partnered with Monogram, through the reduction and/or elimination of medical services delivered to patients.

67. Defendants Monogram's interests were directly opposed to the interests of the patients whose medical outcomes Defendants aimed to alter.

68. Defendants expressly valued profits for their partners including Cigna and Humana over the best interests of patients.

69. Monogram often tortiously interfered with and jeopardized long standing patient-physician relationships, between the insured member and their community nephrologist. For instance, the understanding between some patients and their nephrologist was that the patient should and would receive renal replacement therapy including dialysis as and when needed by the patient. Then Monogram staff intentionally deceived their way into the decision-making process, through material misrepresentations and omissions. Monogram staff were trained to use fear and misconceptions in order to persuade patients and patients' relatives that (1) dialysis would not improve the quality of life; (2) dialysis would interfere with the precious little time patients had left to spend with their family; and (3) dialysis would prolong their suffering by prolonging their lives.

70. This three-step, false analysis, was part of the Monogram playbook. Patients were encouraged to disregard lifesaving, life extending, and quality of life improving medical services. Patients were not informed that Defendants Monogram's interest was in saving their coconspirators money, because this knowledge would have materially altered Monogram's ability to participate in the medical decision-making process. Without this trust gained through this material deception and/or omission, Monogram could not remain in business. Therefore, Monogram engages in fraud through material misrepresentations and omissions in

order to gain patients' trust, and the trust of patients' family members and local treating physicians.

71. Defendants Monogram developed and marketed a range of products designed to increase profit margins for health insurance company "partners" including but not limited to Cigna and Humana.

72. Defendants Monogram earned a portion of that savings through kickbacks from its health insurance company "partners" including but not limited to Cigna and Humana.

73. At all times relevant to this civil action, and containing through the present, Monogram maintained two primary product lines: (1) the Managed Care Side, and (2) the Kidney Care Practice.

74. At all times relevant to this civil action and continuing through the present, Monogram's two product lines worked in conjunction with one-another where Monogram used the Managed Care Side in order to make self-referrals to its Kidney Care Practice.

75. The Managed Care side of Monogram's product line focused on sending Monogram Venders, often who were nurse practitioners, to patients' homes, in order to make first contact with the patients, the patients' family close members, and the patients' local treating medical care providers.

76. On the Managed Care side, Monogram delivered no medical services to patients. The objective on the Managed Care side was to identify lucrative

diagnosis codes that would significantly increase the monthly capitated payments made to Monogram's health insurance company "partners" including but not limited to Cigna and Humana.

77. On the Managed Care side, Monogram also earned revenues through kickbacks from its health insurance company "partners" including but not limited to Cigna and Humana, through the reduction and/or elimination of medical care costs connected to expensive medical services patients required.

78. Monogram specifically focused on the sickest patients because the sickest patients afforded Defendants the largest opportunity to cut costs and increase profits.

79. Monogram's second product line was the Kidney Care Practice. The Kidney Care Practice received patients through self-referrals of patients Monogram visited on the Managed Care side.

80. When visiting a patient's home, the Monogram Venders kept an eye out for patients that Monogram could self-refer to its Kidney Care Practice. Patients who participated in Monogram's Kidney Care Practice received telemedicine visits with Monogram employees, often nephrologists. Monogram then billed the health insurance providers, including Medicare, Medicaid, and Medicare Part C programs and Medicare Advantage Programs for the medical services rendered provided by Monogram employees through telemedicine.

81. Monogram often engaged in fraudulent billing practices for services rendered through Monogram's Kidney Care Practice. The treating medical professionals including nephrologists, were cut out of the billing process, so that the medical professionals, physicians, nurse practitioners, and nurses had no connection, oversite, confirmation, or involvement in what Monogram billed the insurance companies for the services provided.

82. Monogram paid a predetermined annual salary to its medical professionals and Monogram did not allow the medical professionals to have any involvement in the billing practice.

83. Monogram delivered its Kidney Care Practice to patients across the country in various states including states that maintain restricted access requirements for nurse practitioner.

84. In restricted practice states, nurse practitioners must work under the supervision of a physician for all of their scope of practice. While they may have extensive autonomy in some nurse practitioner functions, they are not acting as independent practitioners. However, some states may loosen restrictions as the NP gains experience.

85. Monogram disregarded state requirements for nurse practitioners and sent nurse practitioners into states with restricted access to evaluate and make self-referrals from Monogram's Managed Care side to its Kidney Care Practice.

86. The physicians assigned to some of these nurse practitioners were also not licensed to practice medicine in states in which Monogram delivered telemedicine services though the Kidney Care Practice.

87. Accordingly, Monogram had to fraudulently bill insurance providers in order receive payment for services Monogram delivered through its Kidney Care Practice.

88. For example, when a Monogram doctor delivered telemedicine services to a patient in a state where that doctor was not licensed, Monogram directed another doctor to sign the medical records so that Monogram could receive payment from the health insurance company providers, including Medicare and/or Medicaid.

89. When the Monogram Venders, often nurse practitioners, visited the patient's home, the nurse practitioner was supposed to work within the supervision of a physician who was licensed in that state, for restricted practice authority states.

90. Monogram relied heavily on its nurse practitioners to make first contact with patients on the Managed Care side, so that Monogram made the decision to disregard state requirements in restricted practice authority states.

91. Monogram employee-physicians were instructed to work and deliver medical services within this illegal business structure. When Monogram physicians were called upon by the state Medical Board to answer questions about this

practice, Monogram instructed its employees to take the blame for its illegal scheme.

92. Monogram billed for medical treatment that was not legal in the state in which the services were provided.

93. Monogram instructed doctors who never treated certain patients to sign forms for those same patients in order to facilitate the payment of medical bills.

94. One doctor who was not licensed would treat the patients and another Monogram doctor who was licensed signed the electronic medical records so that Monogram could get paid for the illegal treatment.

95. The doctors and nurses who treated the patients did not bill for their time. These medical providers never saw and had no contact with the medical bills.

96. Monogram handled the billing entirely through a central office in Tennessee that has no connection with the patients who were treated.

97. Monogram submitted the bills to Medicaid, Medicare, and the insurance companies for payment

98. Monogram refused and continues to refuse to provide its own doctors with case logs due to Monogram's fraudulent billing practices.

99. Several doctors who were employed by Monogram have requested case logs that show the patients those doctors have cared for and/or treated. Monogram refuses to provide its own doctors with case logs due to Monogram's fraudulent and/or illegal billing practices.

100. Monogram represents to the doctors that Monogram pays to deliver medical care that Monogram does not have access to its own case logs.

101. Accordingly, Monogram does not maintain case logs for the patients that Monogram treats or does but refuses to provide the case logs to its own doctors due to this billing scheme.

102. Monogram leadership expressly instructed Monogram staff including Dr. Gupta to focus on the sickest patients.

103. During Dr. Gupta's employment, Dr. Gupta was assigned to work with patients determined by a geographical region.

104. Dr. Gupta's assigned regions included the southeastern parts of the United States including Tennessee and/or Mississippi and/or Louisiana

105. Within this region, Dr. Gupta managed a team of nurses, nurse practitioners, social workers, and pharmacists.

106. Dr. Gupta managed two teams and scheduled weekly teleconferences with the teams he managed, during which Dr. Gupta reviewed opportunities for Monogram to use its influence with patients and the patients' local medical providers.

107. The primary objective was to locate opportunities where health insurance companies including Cigna and Humana could save money spent through reduced medical services delivered to the patients. Accordingly, Dr. Gupta was instructed both verbally and in writing to focus on the sickest patients.

108. At all times relevant to this civil action there was a Grand Canyon sized conflict of interest between what was best for Monogram, Cigna, and Humana and what was in the best interest of the patients/insureds.

109. Defendants Monogram had express knowledge as to this conflict of interest and exploited ways to circumvent the conflict of interest to fraudulently exert influence over patients and the medical decision-making process.

110. Defendants Monogram intentionally concealed material information favored concealment over disclosure, and manipulation over acknowledgement and notice.

111. Patients were not informed that Monogram staff including Dr. Gupta did not agree with the recommendations made to patients with chronic kidney disease. Dr. Gupta often disagreed with Monogram objectives, and agreed with the local, treating nephrologist, that patients should begin dialysis in a hospital setting, that patients should prolong life through dialysis, and that patient's quality of life would significantly improve through medical services including dialysis.

112. Monogram singled out local, treating, nephologists who did not go along with the recommendations of Monogram. These local doctors were threatened, and "dinged" by Monogram so that there was a negative mark associated with these local doctors.

113. The local doctors who acted in the best interest of the patients and against the financial interest of Monogram, Cigna, and Humana were put on lists and received what Monogram called, "dings" or black marks.

114. At all times material to this civil action, Defendants Monogram failed to notify patients and patients' medical providers of the huge conflict of interest present in Defendants Monograms' primary objective - to save insurance companies money so that Monogram could take a percentage of that cost reduction as profits/revenue.

115. Had patients known that Monogram's interest was in reducing and/or eliminating costly medical services, patients would not have relied on Monogram's recommendations.

116. Accordingly, concealing its true objective was a part of Monogram's strategy so that Monogram could earn revenues and profits.

117. Defendant, Monogram often targeted patients in a lower income bracket who were at or near the poverty line. Defendant, Monogram then sent medical professionals to these patients' homes in order to begin the process of exerting influence over the patient's decision-making process.

118. Defendants Monogram obtained lists of potential customers through the large insurance conglomerates, including but not limited to, Defendant, Cigna and Defendant, Humana.

119. Defendants Monogram obtained lists of potential customers from Defendant, Cigna and Defendant, Humana and other large health insurance conglomerates and used confidential, HIPAA protected medical records and other confidential information as ammunition, so that Monogram could insert themselves into the lives of patients and local physicians and nephrologists.

120. Defendants Monogram contacted patients and their physicians and nephrologists, whose personal information was provided by Defendant, Cigna and Defendant, Humana and other large health insurance conglomerates.

121. At all times material to this civil action, Defendants Monogram used medical professionals employed by Monogram including but not limited to nurses, nurse practitioners, physicians, and social workers.

122. Monogram employed, nurses, nurse practitioners, and social workers who made first contact with patients and local patient providers under pretext of "being there to help" and "interested in finding ways to help the patient."

123. Defendants Monogram's offer of "help" did not include the disclosure of Monogram's actual mission; to identify and eliminate medical services so that Monogram, Cigna, and Humana could chop of the savings and earn increased profits.

124. Patients' willingness to permit Monogram or Monogram employees into their lives would have materially changed if patients were informed about Monogram's true objective. This material omission constitutes and satisfies each

and every element of fraud, such that Defendants Monogram, Cigna, and Humana was engaged in an unlawful conspiracy and scheme to commit fraud, a RICO predicate, in furtherance of Defendants' objectives to earn money by reducing or eliminating medical services to the detriment of patients.

125. Monogram used medical professionals to cold-call patients. Prior to being cold-called the patients and local patient providers were not notified and did not know who Monogram was or why Monogram had taken an unsolicited interest in the medical care of certain patients.

126. The criteria Monogram used to identify patients for solicitation was based upon a cost-savings analysis for the health insurance companies who provided Monogram the lists of patients and their medical information to begin with.

127. Using statistics, and other mathematical formulas, Defendants identifies patients and specifically the sickest patients, and specifically the sickest patients with multiple comorbidities and chronic kidney disease on whom to focus.

128. Defendants identified patients with chronic kidney disease often concomitant with other comorbidities including but not limited to hypertension, diabetes, heart disease, dementia, cerebrovascular disease, neuropathy, arthritis, and aging. This led to increased health care costs for the insurance companies who partnered with Defendant, Monogram, including Cigna and Humana.

129. Defendant, Monogram then analyzed ways to reduce medical care costs for the insurance companies by reducing and eliminating medical services including medical services patients required to prolong life and improve their quality of life.

130. Accordingly, Defendants targeted older patients and patients with multiple comorbidities.

131. Monogram employees including but not limited to nurses and nurse practitioners contacted the patients and local patient providers with a pre-approved and pre-designed sales scripts generated and provided by Monogram.

132. The objective was to persuade patients and local patient providers to allow Monogram unfettered access to patient medical records including medical history, laboratory tests, the medical decision-making process between the patient and their health care provider such as plans for hemodialysis *versus* peritoneal dialysis *versus* kidney transplant versus conservative management without renal replacement therapy.

133. Defendants Monogram elicited from the patients and local patient providers detailed information about patients' personal lives and patients' most confidential personal information including but not limited to personal family relationships, family dynamics, social-economic status, finances, and status within the community. This included obtaining personal contact information such as emails and cell phone numbers and the emails and cell phone numbers of family

and other individuals within the patients' lives who may have influence over the medical decision-making process.

134. Defendants Monogram used this detailed and extensive personal and medical information to originate, develop and maintain patient dossiers where Monogram maintained a file on each patient to be used to persuade the patient into reducing or eliminating medical services patients needed.

135. Each patient dossier was maintained using a computer program called SALESFORCE (https://www.salesforce.com/ ), which Defendant, Monogram utilized to track each patient for opportunities that Monogram could exploit in order to reduce and/or eliminate costly medical services by often shortening patients life span.

136. At all times relevant to this civil action, Defendants Monogram expended great sums of money and time to develop and maintain these patient dossiers and keep them up to date.

137. The investment Monogram allocated to the creation of these patient dossiers, included the cost to hire and employ medical professionals to contact and/or visit the patients, patients' family members, and local, treating doctors.

138. Defendants Monogram made this investment to gain influence over the patients' medical decision-making process, so that Monogram could save their actual customers, the health insurance companies, money by reducing or

eliminating medical services patients required to extend life and improve quality of their life.

139. Monogram spent millions of dollars to hire and employ teams of doctors, nurses, nurse practitioners, social workers, dietitians, pharmacists and other medical technicians and medical professionals including two physicians specialized in palliative medicine including hospice care.

140. These employees of Monogram, situated across the United States, then used personal and confidential knowledge given to Monogram about the patients from the patients' health insurance providers like Cigna and Humana, with the objective of deceiving patients and misdirecting medical care/services to the detriment of patient longevity and quality of life.

141. Defendants Monogram used healthcare professionals to materially deceive patients into believing that Monogram's interest was in helping the patient. At all times Monogram's interest was in reducing costs and taking a percentage of the costs reduced.

142. Defendants Monogram failed to disclose this material information to the insured members because this information would have negatively impacted Monogram's ability to earn larger profit margins through the reduction or elimination of costly medical services.

143. Monogram operated without the informed consent, authorization, or notification of the patients who were solicited and who relied on Monogram's

material misrepresentations and omissions when making life altering medical decisions.

144. Monogram did not notify patients that Monogram was a for-profit company retained by and partnered with the patients' health insurance companies, with the primary objective of identifying ways to reduce or eliminate costly medical services so that Monogram could take a percentage of that money for itself.

145. Of course, any patient who understood this material information would have kept Monogram at arm's length and would not have permitted Monogram to gain the trust and influence Monogram needed to facilitate the con/scheme.

146. Monogram's interest was in taking kickbacks from health insurance companies like Cigna and Humana.

147. At all times material to this civil action, Defendants Monogram invested millions of dollars to operate a scheme to materially deceive patients to the benefit of the health insurance providers and to the detriment of patients.

148. Defendants Monogram, earned revenues by taking kickbacks from patients' health insurance companies, including but not limited to Defendant, Cigna and Defendant, Humana, that referred Monogram the patients to begin with. The scheme required the express plan of each of the coconspirators – Monogram, Cigna, and Humana.

149. The kickbacks paid to Monogram by Cigna and Humana were proportional to and derived from the amount of money Monogram saved the

insurance providers through the reduction and/or elimination of costly medical services.

150. Monogram's large scale, multi-million-dollar investment was profitable when Monogram identified ways to save the insurance companies money through the reduction and/or elimination of medical services delivered to patients and covered by patients' health insurance providers.

151. Monogram did not have an altruistic or ethical interest in the delivery of medical care or services but instead focused exclusively on the sickest patients and directed Monogram personnel to focus on the sickest patients because Monogram only earned income by reducing medical services and the sickest patients offered the most opportunity to facilitate these reductions.

152. Defendants Monogram did not have an altruistic, ethical, or financial interest in the delivery of medical care that resulted in positive outcomes for patients when those positive outcomes cost health insurance companies more money to cover.

153. Monogram interfered with the doctor-patient relationship by second guessing medical decision rendered by local, treating providers, whose only concern was the best interest of their patient.

154. Defendants Monogram was interested in ways to save money for their insurance company partners who gave Monogram lists of patients to focus upon.

155. Monogram than received kickbacks based on a percentage of the money Monogram saved health insurance providers by persuading patients to reduce and/or eliminate life extending and quality of life improving medical services and care.

156. The money Humana and Cigna received from Medicare to pay for medical procedures intended to prolong the lives of patients, including dialysis, became profits. These profits were also shared with Monogram.

157. At all times related to this civil action, Monogram, Cigna, and Humana were engaged in the operation of a scheme designed to convince patients to make medical decisions based on the financial interest of the Defendants and not in the best interest of the patients.

158. At all times related to this civil action, Monogram, Cigna, and Humana were engaged in the operation of an illegal scheme to use personal, confidential, and HIPAA protected medical information to gain the trust of insureds.

159. Patients allowed, permitted, and acquiesced to Monogram's presence based on the material misrepresentations and omissions and based on the belief that Monogram was there to help the patients.

160. Monogram used personal and confidential medical information to deceive patients and their families into believing that Monogram's mission was the best interest of patients.

161. At all times related to this civil action, Dr. Gorav Bohil was employed by Monogram and held the position of Physician Executive.

162. In this position, Dr. Bohil acted with supervisory authority over other physicians including Dr. Gupta.

163. Dr. Bohil was formerly an emergency room physician.

164. Dr. Bohil worked in the capacity of an administrator in his employment for Monogram.

165. Dr. Bohil was not a nephrologist and did not possess the education, knowledge, training, or certifications to render specialist medical care for patients with chronic kidney disease.

166. Notwithstanding Dr. Bohil's lack of education, knowledge, training, and certifications in nephrology, Dr. Bohil used his position as supervisor to second guess the medical recommendations of local, treating medical providers including nephrologists who specialized in rendering care for chronic kidney disease.

167. Notwithstanding Dr. Bohil's lack of education, knowledge, training, and certifications, Dr. Bohil used his position to second guess the medical recommendations of other nephrologists employed by Defendants including Dr. Gupta.

168. Dr. Bohil openly bragged about his singular objective and ability, to insert himself into the medical care of patients who Dr. Bohil did not treat, did not know, and never met, and affect the decision-making process by persuading

patients and families to reduce or eliminate expensive medical services in the area of chronic kidney disease.

169. Dr. Bohil used information provided by health insurance providers who operated the scheme with Monogram, to deceive patients into allowing Dr. Bohil to reduce and/or eliminate costly medical services.

170. When Dr. Bohil was successful in this objective, Monogram earned kickbacks proportional to the amount of money Dr. Bohil's interventions saved Cigna, Humana and other insurance companies who partnered with and retained Defendants Monogram.

171. This is Defendants Monogram's business model which Monogram applied to Defendant, Cigna; Defendant, Humana, and other health insurance providers as identified herein.

172. Dr. Bohil openly and expressly bragged about his audacity in entering the intensive care unit, talking to ICU physicians about a patient, and persuading ICU physicians present and patients' families through video call, into giving up on costly active care.

173. Dr. Bohil played upon the worst fears of patients and their families and used these fears to deceive patients by materially misrepresenting progenesis.

174. A diagnoses of kidney failure and being placed on dialysis does not mean that patients are at the end of their lives. Furthermore, for any specific patient

with kidney failure the probability is that the patient's health will improve following initiating of dialysis despite presence of many comorbidities.

175. There is no way to predict that such an individual would not experience improvement in health with a trial of dialysis. Therefore, a foregone conclusion about futility of dialysis can only be made in patients who are extremely ill with other comorbidities such as severe heart failure, severe dementia, or terminal cancer.

176. Part of Defendants strategy was to use Medicare ICD10 codes to increase the number of comorbidities associated with patients in order to obtain more money through Medicare and in order to persuade patients into giving up on life extending and quality of life improving medical services.

177. Defendants employed teams of medical professionals whose primary tasks were to review patient records, meet with patients, and list as many ICD10 codes as possible to increase profits derived through government assistance and Medicare.

178. By engaging in this practice, Defendants including Monogram, Humana, and Cigna classified a diagnosis of kidney failure as a death sentence which cannot be treated.

179. Defendants treated chronic kidney disease in the same manner as much more serious, end of life conditions like terminal cancer.

180. Defendants disregarded obvious statistical data including data that indicated that Defendants' mission would lead to the death of patients who were viable candidates for treatment options that would extend life and increase quality of life.

181. In doing so, Defendants ignored the recommendations of their own employees who were Board Certified/eligible nephrologists, and the recommendations of local, treating nephrologists.

182. Defendants also engaged in strategies designed to reduce the number of patients who received medical care in a hospital or in a hospital's intensive care unit ("ICU").

183. This was part of Defendants' strategy to save money paid by health insurance providers and split that savings with Monogram.

184. The motivation for health insurance providers like Defendant, Cigna and Defendant, Humana to persuade patients to decline medical care provided in the intensive care unit ("ICU") is significant because medical care delivered through the ICU is among the highest costing medical care however, it is also where patients can receive the highest level of care and monitoring.

185. Dr. Bohil was one of these doctors, employed by Monogram, and Dr. Bohil's objective was to increase Monogram revenues through kickbacks from Defendant, Cigna and Defendant, Humana.

186. These kickbacks were based on the reduction and/or elimination of costly medical services.

187. The medical care eliminated was often required to extend life and increase quality of life extended.

188. Defendants used deception to convince patients to give up medical care patients needed.

189. Sometime around May 23, 2022, Dr. Gupta participated in a conference call with Dr. Gorav Bohil and Samantha Eckman who was Defendants Monogram's Director of Care Management Operations. During this phone call, Dr. Bohil outlined a scheme to persuade patients into forgoing beneficial medical care that cost the health insurance companies significant amounts of money.

190. During the same call, Dr. Bohil instructed Dr. Gupta that Monogram's objective was to prevent patients from starting Dialysis in a hospital setting. There was no consideration given for patients who required dialysis in a hospital setting.

191. Dr. Gupta reported the troubling, ethical implications and provided examples when patient-lives were put at risk through the delivery of medical services like dialysis in an outpatient setting.

192. Hemodialysis can be safely initiated in an outpatient setting in patients with terminal kidney failure who are otherwise stable. However, in patients who are hemodynamically or otherwise unstable hemodialysis in more safely initiated in

an inpatient setting because of increased availability of trained personnel and equipment with shorter response time.

193. Dr. Gupta explained that a specific patient with terminal kidney failure, discussed during the call had experienced heart failure and massive fluid overload, possibly resulting in frequent falls which could be fainting spells. In Dr. Gupta's judgment, this patient was appropriately hospitalized, and dialysis started should have been administered in an inpatient setting.

194. Dr. Bohil, who was never a nephrologist, disregarded Dr. Gupta's concerns which included the patients' medical history of fluid overload and frequent falls.

195. Dr. Bohil ignored the patient's medical history, the recommendations of experts in the field, and used the patient as an example where Defendants Monogram could save the health insurance company money by persuading the patient and the patient's nephrologist to initiate dialysis treatment in an outpatient setting.

196. Dr. Gupta explained Dr. Bohil that sending such a patient home after fluid removal during the first 1-2 hemodialysis treatments, as opposed to monitoring the patient overnight in a hospital, could put the patient's life at risk.

197. Dr. Bohil vehemently disagreed with Dr. Gupta and Dr. Gupta's patient safety concerns and railed against any treatment decisions that would result in an increased cost to the health insurance provider. It was clear that the only

concern for Monogram was cutting costs and earning kickbacks, and that patient safety took a backseat to profit incentives.

198. There are three common settings where dialysis can be administered: (1) a hospital, (2) home, (3) or in an outpatient dialysis center.

199. Whether a patient decides to initiate their dialysis treatment in a hospital, home, or outpatient center depends upon the medical needs of the patient and the patient's medical history.

200. There are many examples where patients require a hospital setting due to issues and co-morbidities including but not limited to massive fluid overload, heart failure, electrolyte disturbance, low blood pressure, or infection.

201. These comorbidities increase the need for patients to receive dialysis in a hospital setting.

202. Monogram actively employed medical professionals and tasked them with increasing the number of comorbidities assigned to each patient through ICD10 codes, however, Monogram continued to persuade these patients not to receive dialysis in a hospital.

203. The combined effect of increasing the number of comorbidities assigned to a patient through ICD10 codes, and persuading patients not to receive medical services through a hospital led to increased profits for Monogram.

204. Defendants earned more money through Medicare for patients who had additional ICD10 codes.

205. Defendants spent less money for patients who did not receive medical services in a hospital.

206. Monogram took a piece of all of this money from Cigna and Humana.

207. The safest place to receive dialysis treatment is at a hospital, however the hospital setting carries the highest cost for health insurance companies.

208. There are certain patients who present with medical issues such as overload of fluids, irregular heartbeat, heart failure, electrolyte disturbance, low blood pressure, infection, or ischemia, and these patients require the close monitoring and proximity to medical professionals that only an inpatient and overnight stay at a hospital can deliver.

209. Based on Dr. Gupta's experience as a Board-certified nephrologist, twice, (in 1996 and 2006) and has been working as a nephrologist since 1988 on the front lines and treating patients with chronic kidney disease, Dr. Gupta estimates that 30-70% of patients who require hemodialysis, the treatment may be more safely initiated in the hospital inpatient setting rather than at an outpatient hemodialysis center. There are several factors that must be considered in making this determination including age, comorbidities, hemodynamic status, and clinical condition. The necessity for obtaining dialysis in a hospital setting is even higher for older individuals above age-65, and the risk increases again for patients with co-morbidities. These are precisely the types of patients targeted by Monogram.

210. Monogram maintains and operates under a model where nearly 100% of patients who need to initiate dialysis treatment should receive this treatment at home or through an outpatient center.

211. Monogram's conclusion is based entirely on its vested interest of earning revenues by deceiving patients into reducing and/or eliminating medical care, no matter what.

212. Monogram has identified dialysis as one of these costly medical treatments that should be reduced and/or eliminated, even though dialysis is the most important treatment option for patients with chronic kidney disease and holds the most potential for a longer life, a healthier life and a higher a quality of life.

213. During a call with Dr. Gupta, Dr. Bohil outlined Monogram's objective by instructing Dr. Gupta and other employees to use their influence, access to patient records and information. to manipulate patients into making medical decisions that are in the best interest of Monogram.

214. Monograms' interest in directly opposed to the patients who Monogram cons through the illegal scheme.

215. Patients are not placed on notice in connection with this conflict of interest.

216. Patients are not notified that Monogram' earned profits through the insurance company's reduced costs of medical care by the reduction and/or elimination of the very services that Monogram persuades patients to forego.

217. Patient medical providers are likewise not notified about Monogram's conflict of interest.

218. Patients, patients' families, and patients' physicians have repeatedly expressed confusion about Monogram's role in the process and sudden appearance.

219. Monogram's business model and sales pitch involves solicitation and cold-calling patients.

220. As part of the pitch/sales script, Monogram misrepresents that they are there to help patients, however, Monogram does not provide notice of the actual objective – to earn revenues through kickbacks from health insurance companies.

221. Monogram could not operate its business or carry out the company mission without securing the trust of patients and patients' local physicians.

222. Monogram requires this trust to achieve its true mission because patients will not follow Monogram's recommendations if patient knew the truth about Monogram's interest.

223. The health insurance companies who partnered with Defendants Monogram and are complicit in the scheme.

224. The basic elements of fraud are "(1) a material factual misrepresentation; (2) made with knowledge or belief of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in justifiable reliance to that party to his detriment."

225. Each of these elements are satisfied in the execution of Monogram's mission and day-to-day operations.

226. The material misrepresentation occurs when Monogram refuses to notify patients of its actual purpose and presence, and notifies patients that Monogram is there to help the patient.

227. This is a material misrepresentation because the truth would fundamentally alter patients' willingness to allow Monogram into the decision-making process.

228. Patients would not consider Monogram's recommendations if patients were placed on notice that Monogram's recommendations were motivated by a financial interest.

229. Monogram misrepresents the reasons for its involvement through material misrepresentations and/or omissions.

230. At all times material to this civil action, Defendants Monogram knew or should have known of the material misrepresentation made to patients.

231. Monogram employees including but not limited to Dr. Gupta took issue with the troubling nature of Monogram's business model and reported concerns regarding the conflict of interest and the troubling nature of Monogram's involvement with patient records and patient decision-making process.

232. Patients with chronic kidney disease require dialysis to clean patients' blood and remove poisons and toxicities from the body.

233. A majority of patients with kidney failure feel much better after receiving a few dialysis treatments because the dialysis treatments supplement the natural function of patient's kidneys to remove toxins from the body.

234. Patients who require dialysis have kidneys that do not perform the natural blood cleaning function of healthy kidneys.

235. Accordingly, dialysis treatment is 100% directed toward solving the precise ailment causing the patient harm, discomfort, pain, and damage to patients' metabolism and internal organs including the arteries, heart, brain, bones, gut etc.

236. Dialysis accomplishes what healthy kidneys would otherwise do by actually cleaning and filtering the blood.

237. Dialysis treats the cause where medications treat symptoms.

238. When a patient with failing kidneys does not undergo dialysis, their blood and body fill up with toxins and poisons that a healthy kidney would naturally filter and remove via the urine.

239. These toxins and poisons cause patients to feel fatigue, nausea, vomiting, itching, mental fog, loss of appetite, loss of taste, sleepiness, neuropathy, and other symptoms caused by failing kidneys.

240. If a patient with terminal kidney failure does not undergo dialysis, such a patient can also experience fluid overload that can lead to heart failure and death.

241. If a patient with terminal kidney failure does not undergo dialysis such a patient can also experience a buildup of high potassium levels in the blood which can cause irregular heartbeat and death.

242. When a patient finishes the dialysis treatment, all of these conditions can be dissipated, because the patient finishes the dialysis treatment with filtered and clean blood.

243. This is to say that dialysis treatment does the precise thing that patients with chronic kidney disease need to feel better, live longer, and be healthier.

244. Therefore, dialysis treats the cause whereas prescription medications treat symptoms.

245. Monogram operates its business by manipulating patients into forgoing life extending quality of life improving medical treatment.

246. Monogram, Cigna, and Humana engaged in this scheme because of the high cost of medical care associated with dialysis. The objective was to find ways to reduce the cost of medical care for the insurance providers, at the expense of the insureds.

247. Monogram recommends lower cost options such as prescription medications that mask the many symptoms caused by the blood filling up with poisons and toxicities.

248. The so-called medical professionals employed by Monogram do not treat the patients, sometimes never meet the patients, and have no actual connection to the patients.

249. These same people often second guess board-certified nephrologists including local doctors who treated patients for years, to cancel out high-cost healthcare services.

250. At all times during his employment with Monogram, Dr. Gupta resided in Orange County, California.

251. During his employment, Dr. Gupta was assigned to work with hundreds to thousands of patients, most of them located in Southeastern United States. Some of the states assigned to Dr. Gupta included Mississippi and Tennessee and/or Louisiana.

252. Dr. Gupta was never licensed, never worked, and had never treated a patient in this part of the country.

253. Accordingly, the Monogram business model was for patients and patient providers living and working in the Southeastern United States, to be second guessed by Monogram employees in other parties of the country.

254. Dr. Gupta did not know the patients and sometimes never met the patients; but were retained by Cigna and Humana to find ways to reduce health care costs by eliminating healthcare services patients needed.

255. Defendants shared information with one-another including medical information and medical records protected under HIPAA.

256. Patients in other states, across the country who were already treated by Board Certified or Board Eligible medical professionals including nephrologists, who knew the patients, and were directly involved with the patients' medical care were second-guessed by Monogram employees who had no connection with the patient and were present only to lower costs for the insurance providers.

257. Medical professionals who did not agree with Monogram were labeled, "bad actors," "non-compliant," or other monikers and were reported to the insurance companies for further action to be taken.

258. Monogram provided training to help achieve and facilitate the deception.

259. Monogram employs a "death panel" business model, where patients are put out to pasture and lifesaving medical treatment is held back, redirected, averted, and/or preempted so that Defendants can post larger revenues and/or larger profit margins.

260. Defendants are deceiving patients to forgo medical treatment that would result in helping patients extend life and have better extended quality of life.

261. Therefore, patients are deceived into giving up and resigning themselves to die because doing so will help Defendants Monogram post higher revenues and Defendants, Cigna and Humana will post larger profit margins.

262. Defendants Monogram maintains a policy whereby all elderly patients, older than age 80 to 85 years of age should be persuaded to disregard dialysis treatment and focus on prescription drug alternatives and palliative or hospice care to save Defendant, Cigna, and other health insurance conglomerates money.

263. This savings is then kicked back from the health insurance company to Defendants Monogram.

264. During his employment for Defendants Monogram, Dr. Gupta observed a patient in his early seventies who presented with advanced chronic kidney disease and had not yet started dialysis treatment. Based upon Dr. Gupta's approximately twenty years as a Board-Certified nephrologist, Dr. Gupta notified Defendants Monogram that this patient should be considered as a good candidate for dialysis. Dr. Gupta specifically notified Defendants Monogram that this patient should get educated about dialysis instead of opting for palliative care, which was also in line with the recommendations of the patient's treating nephrologist.

265. There was no evidence that Defendants Monogram followed these recommendations from Dr. Gupta and the patient's treating nephrologist.

266. Dr. Gupta was not provided evidence that Defendant Monogram changed its strategy to persuade this patient to avoid dialysis treatment, using the wife to manipulate the patient's medical care.

267. In-persuading patients to forego dialysis Defendants Monogram often misrepresented the picture and outcomes of dialysis treatment by describing a bleak

outlook of the patient's life should the patient choose to begin dialysis or even try dialysis.

268. These are not isolated incidents, but this is the business model upon which Defendants Monogram has grown its business.

269. On June 1, 2022, Defendants Monogram COO, Chris Chi, sent an email to Dr. Gupta and approximately fifteen other Monogram employed physicians identifying another patient that Defendants Monogram used to save Defendant, Humana money by reducing cost of medical care.

270. Chris Chi, a lawyer with little to no medical training concluded that this "78-year-old male Humana MA member in Louisiana was experiencing pain and discomfort at *the end of his life*." Lawyer and COO, Chris Chi had no basis upon which to conclude that this patient's life was at its end, however this conclusion served Defendants Monogram's objective, and was therefore adopted by Defendants Monogram.

271. Lawyer, Chris Chi described in detail Defendants Monogram's business objective, to disagree with the medical recommendations presented by the local, treating medical provider.

272. Defendants Monogram did not consider the possibility that Dialysis treatment could have extended this patient's life, delivered a better quality of life by reducing neuropathic pain if neuropathy was the cause of pain and allowed this

patient to feel better immediately. Dialysis can reduce pain caused by neuropathy, while withholding dialysis can worsen the pain.

273. Instead, Defendants Monogram concluded it would be better, for business objectives, if this patient simply died. This patient's resignation to die would serve the business interests of Defendants Monogram and Defendant, Humana.

274. Defendants Monogram manipulated the patient and patient's family's worst fears by giving credence to their worst fears and using them to mislead the patient into avoiding costly medical treatment.

275. Defendants Monogram was then compensated based on a kickback.

276. On June 1, 2022, Defendants Monogram's Chief Operating Officer, Chris Chi sent an email to approximately fifteen physicians employed with Defendant Monogram.

277. In this email, Mr. Chi stated, "As of June 1, 2022, Monogram's contract with Humana became "full risk."

278. By "full risk" Defendants Monogram referred to the scheme where Defendants Monogram assumed all risk for the total cost of care, net Monogram's fees and Defendants Monogram's contracts were 100% performance based. Accordingly, Defendants Monogram only earned revenues through the kickbacks from the insurance companies based upon a percentage of the total cost of the medical care eliminated from the insurance companies' cost of medical care.

279. Defendants Monogram openly advertised to the insurance companies the idea of a "full risk" contract that Defendants Monogram advertised and sold to its insurance company partners.

280. When Defendants Monogram advertised the idea of a "100% performance based" contract with the insurance companies, the "performance" that Monogram referred to was money. "Performance" = financial performance, while patient outcomes and performing quality medical care had no connection to the product Monogram sold.

281. Defendants Monogram's COO's June 1, 2022, email uses euphemisms to mask the true scheme and motive of Defendants Monogram.

282. Despite the many euphemisms, COO, Chris Chi cannot mask or hide the actual objectives of Defendants Monogram, to keep patients out of hospitals, lowering hospitalization rates, and reducing medical expenses.

283. COO Chris Chi was unable to disguise Defendants Monogram's business plan to prevent patients from receiving necessary hospital care and visits in order to save money.

284. Defendants Monogram's, Defendant, Cigna, and Defendant, Humana are operating a scheme where patients are placed at higher risk.

285. Defendants Monogram employee, Dr. Bohil, also described the business model, to persuade patients and families not to consider treatment that is medically accepted as extending and improving quality of life.

286. Mr. Chi identified in writing the category of patients targeted by this scheme stating, "We should focus on the sickest patients."

287. These so-called "sickest patients," are patients that Defendants Monogram has identified as ripe for pressure and manipulation from Defendants Monogram employees to forgo extending their lives and instead die.

288. Mr. Chi bragged about Defendant Monograms ability to identify the "sickest patients," stating, "Our SVP of Finance Bob Waegelein and our VP of Medical Economics Adam Goode developed 'high risk' analytics that identify the sickest patients for us, based on factors such as number and complexity of co-morbidities, lab values and hospitalization patterns."

289. Defendants Monogram singles out these patients for persuasion to discontinue lifesaving and quality of life improving medical treatments, and uses dishonestly, and mischaracterizations to do so.

290. Defendants Monogram does this to persuade patients to instead consider much less expensive treatments that do not treat the cause but only mask the symptoms temporarily before patients die due to the forgone medical services.

291. In other instances, Defendants Monogram identifies patients with high comorbidities, that require dialysis in a hospital setting. For these patients, Defendants use misdirection and dishonesty to persuade patients to choose services that cost less, even when it implicates an increased risk to the patient. This requires

Monogram to engage in a mission designed to prevent the patient from obtaining treatment or dialysis in a hospital setting.

292. Defendants Monogram is in violation of Stark Law through a strategy where Defendant, Monograms' "success depends upon our RNs and SWs regularly referring patients-especially high-risk ones-over to our great NPs and MDs for direct care. When this happens, we can write the medications, make the orders, and give the medical advice to our patients directly."

293. This part of Defendants Monogram's business model includes self-referrals and gives Defendants the added opportunity to manipulate patients into forgoing lifesaving and quality of life improving medical treatments altogether.

294. Defendants Monograms' COO, Chris Chi, describes in writing the objective to second guess local, treating nephrologists.

295. In another instance, Defendants Monogram interfered with and made contact with the family of a patient to convince the patient to go eliminate altogether costly medical services that the patient required. In this instance, the patient was persuaded based on misinformation to just wait for the disease to result in death. This was not the patient's only option.

296. Common symptoms of chronic kidney disease and kidney failure includes frailty. Patients often feel frail, weak, loss of tase and appetite, fatigue, altered sleep pattern with sleepiness in the day and insomnia at night, itching, memory and cognitive impairment among a host of other symptoms.

297. These symptoms are the reasons patients require dialysis. Dialysis works to resolve these symptoms by attacking the root cause, and cleaning and filtering the blood.

298. Defendants Monogram use the very symptoms of kidney failure to manipulate cost savings for Defendants.

299. Defendants Monogram present the symptoms of the kidney failure as reasons why patients should avoid dialysis, when, they are the reasons patients require dialysis.

300. Defendants Monogram persuades patients to disregard dialysis, when dialysis will reduce or cure current symptoms from which patients suffer.

301. Patients' families and their worst fears about their loved ones are preyed upon and used as leverage to increase revenue for Defendants Monogram and increase margins for Defendant, Cigna and Defendant, Humana.

302. Defendants Monogram intentionally presented false and misleading information to patients and patients' families about dialysis treatment, and the quality-of-life patients receiving dialysis can expect.

303. Defendants undertake this misleading pursuit in the interest of increased revenue for Defendants Monogram and increased margins for Defendant, Cigna and Defendant, Humana.

304. It is undisputed that in a large majority of cases, dialysis treatment extends life and improves the quality of life. This conclusion by Dr. Gupta is recognized by the medical community.

305. Therefore, Defendants Monogram is in the business of shortening patient-lives and decreasing the quality of life of patients with chronic kidney disease.

306. Defendants Monogram got into this business of shortening life and decreasing quality of life because of the enormous profit incentive inherent within.

307. Dr. Gupta's conclusion that dialysis extends life and delivers better quality of life in a large majority of cases is an accepted medical conclusion by Dr. Gupta and his peers in the medical community.

308. Another product that Defendants Monogram markets to health insurance companies is to review health insurance providers customer lists and medical records and find patients ripe for Defendants Monogram's services. As Defendants Monogram has admitted, many of these patients are among the sickest patients who require the forgone medical services the most.

309. Another product that Defendants Monogram markets to health insurance companies is to review health insurance providers customer lists and medical records and find patients that Defendants Monogram can contact to redirect medical services.

310. Defendants Monogram also maintains a product for health insurance providers including Defendant, Cigna and Defendant, Humana, where medical records are reviewed, and billing codes are manipulated to maximize the reimbursement from Medicare, Medicare Advantage Plans, Medicaid, and private health insurance providers.

311. Often this is done with the intention of eliciting larger contributions from Medicare and/or Medicaid.

312. Dr. Bohil gave Dr. Gupta marching orders including the objective that no patient with advanced kidney disease assigned to Dr. Gupta should start dialysis in a hospital. Dr. Bohil explained that Defendants Monogram maintained a zero-tolerance policy in connection with these orders.

313. Dr. Bohil also instructed Dr. Gupta to identify local, treating, nephrologists likely to start patients on dialysis in the hospital and convince them to send these patients to home or outpatient treatment.

314. Dr. Gupta was instructed to keep track of any local, treating physicians who were willing to cooperate with Defendants Monogram's instructions not to allow patients to treat in hospitals, no matter what.

315. Dr. Bohil also instructed Dr. Gupta to identify local, treating physicians who were not willing to cooperate with these draconian, Machiavellian objectives and single these doctors out.

316. In singling out local, treating physicians who did not agree with Defendants Monogram's singularly, profit chasing business model, and place these individuals on a list. Specially, Dr. Gupta was given a quota and assigned the task of identifying five nephrologists resistant to Defendants Monogram's policies.

317. Dr. Bohil called these local, treating physicians, "bad actors."

318. Dr. Bohil labeled these local, treating physicians, "non-compliant."

319. These "non-compliant" nephrologists were to be placed on a list and reported to Defendant Cigna and Defendant, Humana and earmarked for network removal.

320. Defendant Cigna and Defendant, Humana use Defendants Monogram in a campaign and strategy of retaliation against doctors that prioritize patient safety, and best interest of the patient over profit chasing.

321. Doctors who rightly consider patient histories and risks of treatment options are identified and punished for considering the patient's interest over the insurance company's interest.

322. Defendants punish doctors who prioritize the best interest of their patients through a campaign of retaliation aimed toward economic punishment and removal from the network.

323. The objective is to persuade local, treating medical professionals and nephrologists to get in line and follow the direction of insurance companies, patient outcomes notwithstanding.

324. Sometime around May 23, 2022, Samantha Eckman emailed Dr. Gupta, stating, "On each nephrologist tab you will find up to 6 patients to use when you call these nephrologists to see what steps need to be taken proactively to coordinate an outpatient start…

> Reminder, the goal of this project is to reduce the number of patients on the IP Rolling 12 Month Report by having conversations with the nephrologist…What can we do to coordinate outpatient planned starts for the 6 patients on the reference spreadsheet. We have 30 days to make progress on this metric."

325. Around June 8, 2022, Dr. Gupta again raised concerns with his ability to obtain patients medical records from other physicians and if Defendant Monogram and Dr. Gupta was violating HIPAA. Dr. Gupta complained by stating, "Before we began this project I had raised the same legal concerns about seeking PHI on specific patients…For instance Dr. Mansour could get sued by sharing PHI especially with someone not taking care of the patient directly."

326. Only five days after Dr. Gupta's complaints of patient safety and violation of HIPAA, and refusal to give his patients a death sentence and prevent them from prolonging their lives through Dialysis, Dr. Gupta was wrongfully terminated on June 13, 2022.

327. Defendants Humana and Cigna encouraged, partnered with, engaged, and hired Defendant Monogram to use these tactics to select patients who were to be put on palliative care / hospice and allowed to die. This in turn saved

Defendants Humana and Cigna millions of dollars which they would share with Defendant Monogram for convincing, pressuring, and only using doctors that encourage their patients to die.

328. Defendants' scheme was to first: find and be given by Defendant, Humana and Defendant, Cigna "high risk patients" or patients that have chronic kidney disease; second: have their employees add as many co-morbidities and billing codes as possible to each patient to ensure Defendant, Cigna and Defendant, Humana obtain as much money as possible from Medicare, Medicare Advantage Plans and Medicaid to treat the patients; third: fraudulently convince these patients and their families to forego dialysis, hospital treatment, or other life prolonging and lifesaving protocols to instead chose to die. To accomplish this third prong Defendants Monogram violated Stark Law by self-referring patients from the Managed Care side to the Kidney Care side, where the same medical professionals followed Monogram's mission to reduce and/or eliminate lifesaving, life-extending, quality of life improving medical services. Fourth: if Defendant, Monogram is unable to convince a patient to forgo Dialysis, Defendants Monogram forced these patients with many co-morbidities to put their lives at risk by initiating dialysis at their home or at outpatient facilities, saving Defendant, Humana and Defendant, Cigna money but not giving patients the proper monitoring and physician oversight needed. Fifth: Report local physicians and nephrologists who encourage patients to consider life-extending medical services like Dialysis initiated in a hospital so that

these medical professionals received a black mark or "ding" and were eliminated from insurance companies' network. Sixth: create an echo chamber/death panel so that all doctors, nurses, and medical practitioners seen by the patient follows the same script where expensive medical services are disregarded to save insurance providers money.

## FIRST CAUSE OF ACTION
## FALSE CLAIMS ACT 31 U.S.C. §3729
## (Plaintiff v. Defendants)

329. The Government and Dr. Gupta incorporates the foregoing paragraphs as if set forth at length herein.

330. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

331. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

332. By virtue of the acts described above Defendant knowingly made or used, or caused to be made or used, false, or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

333. Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false claims were presented by several separate entities.

334. Plaintiff does not have access to the records of all such false or fraudulent statements, records, or claims.

335. Monogram advertises that its insurance company partners include Agilion Health, Cigna, Humana, Point 32 Health, Harvard Pilgrim Healthcare, TUFTS Health Plan, Scan Health Plan, Devoted Health, A Banner University Health Plans, Amerigroup an Anthem Company, Avent Health, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield Louisiana, Well Care Health Plans, and the United States Department of Veteran Affairs.

336. During the course and scope of his employment, Dr. Gupta worked with patients that originated from insurance companies including Cigna and Humana, where Cigna and Humana provided lists of patients to Monogram, and Monogram targeted these patients based on its mission as described herein.

337. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid, and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

338. By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

339. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation arising from Defendant's unlawful conduct alleged herein.

**SECOND CAUSE OF ACTION**
**FALSE CLAIMS ACT 31 U.S.C. §3729(a)(1)(A)**
**(Plaintiff v. Defendants)**

340. The Government and Dr. Gupta incorporates the foregoing paragraphs as if set forth at length herein.

341. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

342. The federal False Claims Act provides in pertinent part:

> a. Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.
>
> b. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent or defraud is required. See 31 U.S.C. §3729 (a) & (b).

343. Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth)

presenting, or causing to be presented, false or fraudulent claims for payment or approval to CMS resulting in Defendants receiving Medicare payments from CMS to which it was not entitled.

344. Specifically, Defendants operated a partnership designed to knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) present or caused to be presented false claims for risk adjustment payments by submitting false, inaccurate, improper, or invalid diagnosis codes for Medicare Part C patients enrolled in Cigna MA Plans, in violation of CMS regulations and policies and other requirements, which Cigna agreed to and was obligated to comply with.

345. If CMS had known that Defendants had presented or caused to be presented false claims based on these false, inaccurate, improper, and invalid diagnosis codes, CMS would have refused to make risk adjustment payments based on the false, inaccurate, improper, and invalid coding and/or taken other appropriate actions to ensure that Cigna did not receive or retain risk adjustment payments to which it was not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

346. By reason of the false claims that Cigna knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**THIRD CAUSE OF ACTION**
**FALSE CLAIMS ACT 31 U.S.C. §3729(A)(1)(B)**
**MAKING AND USING FALSE RECORDS OR STATEMENTS**
**(Plaintiff v. Defendants)**

347. The Government and Dr. Gupta incorporates the foregoing paragraphs as if set forth at length herein.

348. Defendants violated 31 U.S.C. § 3729(a)(1)(b) by knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) making, using, or causing to be made or used false records and statements material to false or fraudulent claims, resulting in Defendants receiving Medicare payments from CMS to which it was not entitled.

349. Specifically, Defendants knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) made, used, or caused to be made or used false records and statements—in the form of, for example, false risk adjustment submissions and false annual Part C attestations—that were material to the payment of false claims for risk adjustment payments for Medicare Part C patients.

350. If CMS had known that Cigna had made, used, or caused to be made or used false records or statements material to these false claims, CMS would have refused to make risk adjustment payments based on the inaccurate, improper, and invalid coding and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk adjustment payments to which it was not entitled, including

by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

351. By reason of these false records or statements, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

**FOURTH CAUSE OF ACTION**
**ANTI-KICKBACK STATUTE [42 U.S.C. § 1320A-7B(B)]**
**(Plaintiff V. Defendants)**

352. Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

353. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

354. The Anti-Kickback Statute prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients).

355. Remuneration includes anything of value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies.

356. In the Federal health care programs, paying for referrals is a crime.

357. The statute covers the payers of kickbacks-those who offer or pay remuneration- as well as the recipients of kickbacks-those who solicit or receive remuneration.

358. Defendants knowingly and willfully intended to enter and entered into a quid pro quo arrangement between Monogram and Monogram's health insurance company partners.

359. Monogram advertises that its health insurance company partners include Agilion Health, Cigna, Humana, Point 32 Health, Harvard Pilgrim Healthcare, TUFTS Health Plan, Scan Health Plan, Devoted Health, A Banner University Health Plans, Amerigroup an Anthem Company, Avent Health, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield Louisiana, Well Care Health Plans, and the United States Department of Veteran Affairs.

360. Monogram enters into a partnership with these health insurance company partners and agrees to be paid 100% through kickbacks.

361. Monogram calls this program its "Full Risk" product.

362. In a "full risk" partnership, Monogram agrees that it will only be paid in kickbacks.

363. In order to enter into a full risk partnership, all members of the partnership have to agree that profit margins take precedence over patient care.

364. Criminal penalties and administrative sanctions for violating the Anti-Kickback Statute include fines, jail terms, and exclusion from participation in the Federal health care programs.

365. Defendants paid and/or accepted kickbacks in a trade where one party agreed to operate a fraudulent scheme to the benefit of its partners. The kickback was the payment mechanism that the insurance companies paid to Monogram in exchange for Monogram's illegal, fraudulent activities.

366. To facilitate this quid pro quo arrangement Defendants had to disregard Medicare and Medicaid laws and engage in a material deception against patients' interests.

367. The quid pro quo arrangement between Defendants will unnecessarily and unlawfully increase the cost of healthcare by violating Medicare and Medicaid laws.

368. The Anti-Kickback Statute (42 U.S.C. § 1320a-7a(a)(5)) imposes civil monetary penalties on physicians who offer remuneration to Medicare and Medicaid beneficiaries to influence them to use their services.

**FIFTH CAUSE OF CATION**
**PHYSICIAN SELF-REFERRAL LAW [42 U.S.C. § 1395NN]**
**(Plaintiff V. Defendants)**

369. Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

370. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

371. The Physician Self-Referral Law, commonly referred to as the Stark law, prohibits physicians from referring patients to receive "designated health services" payable by Medicare or Medicaid from entities with which the physician or an immediate family member has a financial relationship.

372. Financial relationships include both ownership/investment interests and compensation arrangements.

373. The Stark law prohibits the submission, or causing the submission, of claims in violation of the law's restrictions on referrals.

374. Penalties for physicians who violate the Stark law include fines as well as exclusion from participation in the Federal health care programs.

375. Defendants specifically entered into an agreement where Monogram agreed to partner with Cigna and Humana and other nationwide health insurance companies and provide fraudulent services to the insureds in order to increase profit margins and post increased revenues.

376. Importantly Defendants must disregard Medicaid and Medicare laws in order to affirm the partnership as Defendants are not able to choose where stroke patients are referred.

377. Medicare and Medicaid laws require that patient referrals from one hospital to another must be referred to the nearest appropriate facility.

378. These laws requiring patients to be referred to the nearest appropriate facility are crucial to maintaining the cost of healthcare services for the United States taxpayer.

379. The United States Healthcare system relies on healthcare providers to act in accordance with Medicare and Medicaid laws.

380. Defendants chose to enter into a quid pro quo fraudulent agreement whereby Defendants acted to circumvent, avoid, and disregard Medicare and Medicaid laws in order to increase profit margins and earn revenues through illegal self-referrals and illegal kickbacks.

381. The operation of this scheme also involved illegal, fraudulent billing and the fraudulent concealment of material facts and omissions to the detriment of patients and their families.

382. The operation of this scheme also involved the tortious interference of the doctor patient relationship to the detriment of local, front-line, treating kidney care doctors and nephrologists.

383. Defendants are in the process of vertical and horizonal marketing to enlarge this fraudulent program to increase market share and enter into additional contracts with other health insurance companies across the United States.

**SIXTH CAUSE OF ACTION**
**RETALIATION**
**FALSE CLAIMS ACT, 31 U.S.C. §3730(H)**
**(Plaintiff V. Defendants)**

384. The Government and Dr. Gupta incorporates the foregoing paragraphs as if set forth at length herein.

385. The federal False Claims Act anti-retaliation provision provides in pertinent part

> (1) In general.--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter… See 37 U.S.C.A. §3730 (h).

386. Plaintiff engaged protected activity when he made internal complaints to Defendants and when he made complaints about the fraudulent billing practices in furtherance of an action under the False Claims Act.

387. Defendants were aware of Plaintiff's protected conduct and thus were aware of the distinct possibility of False Claims Act litigation.

388. Specifically, Plaintiff's numerous internal conversations opposing Defendants' business model and pointing out and reporting serious issues presented by the operation of Defendants' business model.

389. Dr. Gupta reported these issues both verbally and in writing including sending an email that questioned the violation of patient privacy and HIPAA laws.

390. Defendants responded to Dr. Gupta's concerns and reports by terminating Dr. Gupta's employment.

391. Defendants retaliated against Plaintiff by unlawfully terminating Plaintiff's employment.

392. Defendants continue to refuse to provide Dr. Gupta with patient logs in connection with the time Dr. Gupta was employed by Monogram and the patients Dr. Gupta came into contact with during his employment.

393. Defendants terminated Plaintiff's employment due to Plaintiff engaging in protected activity and reporting and opposing Defendants' ongoing illegal conduct.

394. Defendant's materially adverse actions of discharging Plaintiff was temporally proximate to Plaintiff's protected activity such that it/they are usually suggestive of retaliation.

395. Furthermore, there is clear evidence of retaliatory animus in Defendant's actions to support that Defendant's conduct were supported and motivated by retaliation for Plaintiff's above referenced protected conduct.

396. As a direct and proximate result of Defendant's retaliation, Plaintiff has loss of wages, loss of benefits, loss of 401K, out-of-pocket expenses, pain and

suffering, emotional damages and harms, loss of reputation, loss of enjoyment of life.

397. Plaintiff seeks all damages recoverable including double (2x) his backpay damages, interest on his backpay damages, costs of litigation, and reasonable attorney's fees.

**SEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

398. The Government and Dr. Gupta incorporates the foregoing paragraphs as if set forth at length.

399. Through the acts set forth above, Defendants have received payments from the Government to which it was not entitled, which unjustly enriched Defendants Monogram, Cigna and Humana, and for which it must make restitution.

400. Defendants received such payments based on the submission of false, inaccurate, improper, and invalid diagnosis codes included in their risk adjustment data submissions to CMS.

401. In equity and good conscience, such money belongs to the Government and to the Medicare Program and should not be retained by Defendants, Monogram Cigna, and Humana.

402. The Government is entitled to recover such money from Defendants in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**Payment By Mistake**

403. The Government and Dr. Gupta incorporates the foregoing paragraphs as if set forth at length.

404. The Government paid money to Defendants as a result of a mistaken understanding. Specifically, the Government paid Defendants claims for risk adjustment payments under the mistaken and erroneous belief that such claims were based on the submission of true, accurate, proper, and valid diagnosis codes included in their risk adjustment data submissions to CMS.

405. Had the Government known the truth, it would not have paid such claims. Those payments were therefore by mistake.

406. As result of such mistaken payments, the Government has sustained damages for which Cigna is liable in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
**FOR WRONGFUL TERMINATION IN VIOLATION OF CAL. PUBLIC POLICY**
**(Against Defendant MONOGRAM)**

407. Plaintiff incorporates by reference and re-alleges the preceding paragraphs, as though fully stated herein.

408. At all times mentioned in this Complaint, it was a fundamental policy in the State of California that Defendants cannot retaliate against any employee on the basis of complaints of violations of the law or patient safety.

409. Plaintiff's race, color, national origin, engagement in a protected activity, and/or complaints of patient safety and illegal conduct by Defendants, were factors in Defendants' conduct as alleged hereinabove.

410. Such retaliation, resulting in the wrongful termination of Plaintiff's employment on the basis of Plaintiff's engagement in a protected activity, complaints of illegal conduct and patient safety, and/or some combinations thereof, were proximate cause in Plaintiff's damages as stated below.

411. Because Plaintiff complained health and safety code violations, risks to patient health and safety, fraud, violations of California and Federal law, and non-compliance with other state and federal laws, Plaintiff was wrongfully terminated.

412. The above said acts of Defendants constitute violations of the Government Code and the public policy of the State of California embodied therein as set forth above. Defendants violated these laws by discriminating and retaliating against Plaintiff and terminating Plaintiff's employment in discrimination of Plaintiff's protected classes and in retaliation for Plaintiff's exercise of protected rights.

413. As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

414. As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to Plaintiff's damage in a sum according to proof.

415. The foregoing conduct of Defendants individually, or by and through their managing agents, was intended by Defendants to cause injury to Plaintiff or was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's right to be free from interference by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, such as to constitute malice, oppression, or fraud under Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

**TENTH CAUSE OF ACTION**
**FOR UNLAWFUL WHISTLEBLOWER RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE §1102.5**
(Against Defendant MONOGRAM)

416. Plaintiff incorporates by reference and re-alleges the preceding paragraphs, as though fully stated herein.

417. Throughout Plaintiff's employment, Plaintiff complained to Defendants in regard to health and safety code violations, risks to patient health and

safety, fraud, violations of California and Federal law, and non-compliance with other state and federal laws.

418. Defendants retaliated against Plaintiff for reporting and complaining by wrongfully terminating Plaintiff.

419. Defendant MONOGRAM's conduct was in violation of California Labor Code §1102.5.

420. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer damages in the form of lost wages and other employment benefits, and emotional distress, the exact amount of which will be proven at trial.

421. The foregoing conduct engaged in, authorized and ratified by Defendant MONOGRAM, and each of their directors, officers and/or managing agents, constitutes malice, fraud, and oppression, and was authorized, ratified, and carried on with a conscious and willful disregard of Plaintiff's right to work in an environment free from retaliation based on making reports and complaints of health and safety code violations, risks to patient health and safety, fraud, violations of California and Federal law, and non-compliance with other state and federal laws, so as to justify punitive and exemplary damages in an amount appropriate to punish and make an example of Defendant MONOGRAM.

422. As a direct and proximate result of the foregoing conduct, Plaintiff is entitled to recover, in addition to the damages alleged above, attorneys' fees and

costs pursuant to California Code of Civil Procedure § 1021.5, and prejudgment interest pursuant to California Civil Code §§ 3287, 3288, and 3291.

**ELEVENTH CAUSE OF ACTION**
**FOR VIOLATIONS OF HEALTH AND SAFETY CODE §1278.5**
(Against All Defendant MONOGRAM)

423. Plaintiff incorporates by reference and re-alleges the preceding paragraphs, as though fully stated herein.

424. At all times material, Health and Safety Code §§ 12950 et seq. were in full force and effect and were binding on all Defendants. HSC § 1278.5(b)(1) states a "health facility shall not discriminate or retaliate, in any manner, against a patient, employee, member of the medical staff, or other health care worker of the health facility because that person has ...[p]resented a grievance, complaint, or report to the facility ... or the medical staff of the facility..."

425. As described above, Plaintiff complained of health and safety code violations, risks to patient health and safety, fraud, violations of California and Federal law, and non-compliance with other state and federal laws to Defendants MONOGRAM.

426. Defendants subjected Plaintiff to adverse employment actions when they retaliated against Plaintiff by wrongfully terminating Plaintiff.

427. Plaintiff's engagement in the protected activities described above were substantial motivating reasons for Defendant to take the adverse employment

actions described above as evidenced by the temporal proximity between Plaintiff's protected activities and the adverse employment actions taken against Plaintiff.

428. As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered actual, consequential, and incidental financial losses, including without limitation loss of salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's reputation, all in an amount subject to proof at the time of trial. Plaintiff claims such amounts as damages together with prejudgment interest pursuant to Civil Code §§ 3287 and/or 3288 and/or any other provision of law providing for prejudgment interest.

429. As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Plaintiff has further experienced other physical symptoms arising from the wrongful acts of Defendants, and each of them. Plaintiff will continue to experience said pain and physical and emotional suffering for a period in the future Plaintiff cannot presently ascertain, all in an amount subject to proof at the time of trial.

430. The acts taken toward Plaintiff were carried out by and/or ratified by Defendants and/or managing agent employees of Defendants acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner in order to injure and damage Plaintiff, thereby justifying an award to Plaintiff of

punitive damages in a sum appropriate to punish and make an example of Defendants, and each of them.

**TWELFTH CAUSE OF ACTION**
**FOR VIOLATION OF LABOR CODE §6310**
(Against Defendant MONOGRAM)

431. Plaintiff incorporates by reference and re-alleges the preceding paragraphs, as though fully stated herein.

432. Labor Code § 6310 state "[n]o person shall discharge or in any manner discriminate against any employee because the employee has … made any oral or written complaint to … their employer, or their representative.

433. As described above, Plaintiff made written and oral complaints related to health and safety code violations, risks to patient health and safety, fraud, violations of California and Federal law, and non-compliance with other state and federal laws.

434. As described above Defendants subjected Plaintiff to adverse employment actions in retaliation for Plaintiff making oral and written complaints about patient health and safety.

435. As a proximate result of the wrongful acts of Defendants, Plaintiff has been harmed in that Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation loss of salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damages to Plaintiff's professional reputation, all in an amount subject to proof

at the time of trial. Plaintiff claims such amounts as damages together with prejudgment interest pursuant to Civ. Code §§ 3287 and/or 3288 and/or any other provision of law providing for prejudgment interest.

436. As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer severe back pain, acid peptic disease, asthma exacerbations, post-traumatic stress, anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress and has incurred and will likely incur, medical expenses as a result. Plaintiff will continue to experience said pain and mental and emotional suffering for a period in the future Plaintiff cannot presently ascertain, all in an amount subject to proof at the time of trial.

437. The acts taken toward Plaintiff were carried out by and/or ratified by Defendants and/or managing agent employees of Defendants acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner in order to injure and damage Plaintiff, thereby justifying an award to Plaintiff of punitive damages in a sum appropriate to punish and make an example of Defendants, and each of them.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF, Dr. Ajay Gupta, M.D. prays for judgment as follows from all named Defendants recoverable under law and as deemed reasonable and just by the Court. This includes but is not limited to judgement

against Defendants as follows: As to All Causes of Action:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

2. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of31 U.S.C. § 3729;

3. That Plaintiff be awarded the maximum amount allowed pursuant to§ 3730(d) of the False Claims Act.

4. For general, compensatory, and/or special damages in an amount according to proof for Plaintiff's injuries, mental and/or emotional distress, medical expenses, actual financial losses, consequential financial losses, incidental financial losses, loss of past and future earnings, loss of salary and benefits, and all damages flowing therefrom for an amount to be determined at trial;

5. For all general and special damages to compensate Plaintiff for an amount to be determined at trial;

6. For punitive damages, as allowed by law, that will sufficiently punish, make an example of, and deter future conduct by Defendants for an amount to be determined at trial;

7. For prejudgment and post-judgment interest according to any applicable provision of law, according to proof for an amount to be determined at trial;

8. For attorney's fees and costs for an amount to be determined at trial;

9. Costs of suit; and

10. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relater hereby demands a jury trial on all issues to be tried and all causes of action and claims with respect to which Realtor has a right to jury trial.

**DEREK SMITH LAW GROUP, LLP**

BY: *<u>/s/ Matt Finkelberg</u>*

Matt E.O. Finkelberg, Esq
US Bank Tower
633 W 5th Street, Suite 3250
Los Angeles, CA 90071
Phone: 310.602.6050
Email: Matt@dereksmithlaw.com
*Attorney for Plaintiff and Relator*

DATED: December 1, 2022